IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

WORKSHARE TECHNOLOGY, INC., )
)
       Plaintiff and Counterclaim )
       Defendant, )
)
       v. )             1:11CV825
)
LITERA TECHNOLOGIES, LLC, )
)
       Defendant and )
       Counterclaim Plaintiff. )

MEMORANDUM OPINION AND ORDER

BEATY, District Judge.

       This case involves a patent dispute between Plaintiff and counterclaim Defendant

Workshare Technology, Inc. ("Plaintiff" or "Workshare") and Defendant and counterclaim

Plaintiff Litera Technologies, LLC ("Defendant" or "Litera Tech") involving U.S. Patent No.

7,895,276 ("'276 Patent") and U.S. Patent No. 8,060,575 ("'575 Patent"). Workshare originally

filed this suit seeking a declaratory judgment of non-infringement and invalidity, and Litera Tech

counterclaimed for infringement. This matter is presently before the Court for an interpretation

of nine disputed claim terms contained within the '276 Patent and/or the '575 Patent. After

receiving initial claim construction briefs from both parties, the Court held a Claim Construction

hearing on February 14, 2013. Based on the arguments submitted to the Court in the parties'

briefings and at the hearing, the Court will now construe the nine disputed claim terms in

accordance with the principles of claim construction.

## I.    FACTUAL BACKGROUND

Both of the Patents at issue for construction address the scrubbing of metadata[1] from electronic documents attached to e-mails.  Both Patents were issued by the U.S. Patent and Trademark Office ("PTO") to Mr. Deepak Massand ("Mr. Massand").  The '276 Patent was issued to Mr. Massand on February 22, 2011, for a "Method of Managing Metadata in Attachments to E-mails in a Network Environment."  The '575 Patent was issued to Mr. Massand on November 15, 2011, for "Methods and Systems for Managing Metadata in Email Attachments in a Network Environment."  Mr. Massand then assigned both Patents to Defendant Litera Tech.

The '276 Patent and the '575 Patent both contain the following "Summary" section within the Patents' specifications:

> The present invention provides for a computer based system and method for removing metadata from a document attached to an email.  An email sent from a mobile device is received by a gateway, email server, or other program.  The email is analyzed to determine whether it has an attached document.  In the event the email includes an attached document the attached document is analyzed to determine the nature of metadata in the document. If the attached document includes metadata the metadata may be cleaned, or the email and or the attachment may be analyzed to determine whether the metadata is to be removed.  If the metadata is to be removed a cleaned version of the attached document is created with the metadata, or the desired portion of the metadata, removed.  The attached document is replaced with the cleansed version of the attached document, and the email is sent according to the address (or addresses) included in the email (or other delivery instructions specified in either the email or at the gateway, email server or other program).  A copy of the cleansed document may be retained.  A person, for example a user or administrator, may be notified of the attempt to send a document with metadata, or a person may be

---

[1]"Metadata" can be defined as "secondary data that organize, manage, and facilitate the use and understanding of primary data."  Black's Law Dictionary (9th ed. 2009).

2

given the option of allowing over-ride cleansing the metadata and sending the original attached document with the metadata. A log of all attachments that were cleaned of Metadata may be optionally saved for any desired duration.

('276 Patent col. 2, lines 1-27; '575 Patent col. 2, lines 10-34.)

While the '276 Patent and the '575 Patent share the same "Summary" and generally address the same process, the '276 Patent more specifically addresses the methods of transmitting an electronic document while the '575 Patent more specifically addresses the computer-based system for transmitting an electronic document. Because both Patents generally address the removal of metadata from electronic documents, many of the proposed terms for construction are included within both the '276 Patent and the '575 Patent. With regard to disputed terms used in both Patents, the Court's constructions will apply in the context of both the '276 Patent and the '575 Patent.

In preparation for the Claim Construction hearing, both parties submitted proposed terms for construction. While Litera Tech submitted that none of the claim terms needed to be construed, Workshare contended that nine claim terms needed to be construed. The nine terms Workshare proposed for construction are as follows: (1) "receiving the email message having a delivery address at an intermediate computer system"; (2) "delivery address"; (3) "delivery instructions"; (4) "automatically creating a cleansed version" / "automatically remov[ing] the metadata"; (5) "[according to a] cleansing policy"; (6) "pre-specified"; (7) "intermediate computer system" / "intermediate computer"; (8) "remote"; and (9) ". . . ; and a processor configured to:". To begin its analysis, the Court will first review general principles of claim construction and will then apply these principles to each of the nine disputed terms.

3

## II.    PRINCIPLES OF CLAIM CONSTRUCTION

It is a "bedrock principle" of patent law that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotations omitted). In Markman v. Westview Instruments, Inc., 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996), the Supreme Court held that the language of patent claims is to be interpreted by a judge, not a jury. Thus, claim construction requires a court to ascertain the meaning of a patent's claims in order to define the scope of the patented invention. See Phillips, 415 F.3d at 1312.

It is well settled that, in interpreting an asserted claim, a court should look to the intrinsic evidence of record, including "the claims, the specification and, if in evidence, the prosecution history." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). First, a court should "look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." Id. Generally, the words of a patent claim are "given their ordinary and customary meaning," that is, the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips, 415 F.3d at 1312-13 (internal quotations omitted). "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id. at 1313.

Second, a court must also "review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." Vitronics Corp., 90

4

F.3d at 1582. The specification "contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it." Id. Thus, the "specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." Id. Accordingly, "the specification is always highly relevant to the claim construction analysis" and "[u]sually, it is dispositive." Id.

The third type of intrinsic evidence a court should consider is the patent's prosecution history, if it is in evidence. Id. This history, if available, "contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." Id. "As such, the record before the Patent and Trademark Office is often of critical significance in determining the meaning of the claims." Id. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." Phillips, 415 F.3d at 1317.

Where an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term, it is improper to rely on extrinsic evidence. Vitronics Corp., 90 F.3d at 1583. However, if intrinsic evidence cannot resolve an ambiguity in a disputed term, extrinsic evidence may be considered. Id. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Phillips, 415 F.3d at 1317. Still, extrinsic evidence should only be used for a court's understanding of the patent and "not for the purpose of varying or contradicting the terms of

5

the claims." Markman v. Westview Instruments, Inc., 52 F.3d 967, 981 (Fed. Cir. 1995).

Finally, where, as here, a party alleges that certain claim terms are too indefinite to be construed, this allegation implicates the Patent Act's requirement that a patent's specification "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." 35 U.S.C. § 112. The purpose of the definiteness requirement "is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude." Haemonetics Corp. v. Baxter Healthcare Corp., 607 F.3d 776, 783 (Fed. Cir. 2010) (quoting Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347 (Fed. Cir. 2005)). To provide this notice, "claims need not be plain on their face in order to avoid condemnation for indefiniteness." Wellman, Inc. v. Eastman Chem. Co., 642 F.3d 1355, 1366 (Fed. Cir. 2011). Rather, "claims must only be amenable to construction." Id. "Because claim construction frequently poses difficult questions over which reasonable minds may disagree, proof of indefiniteness must meet an exacting standard." Id. (internal quotations omitted). Thus, "an accused infringer claiming patent invalidity must 'demonstrate by clear and convincing evidence that one of ordinary skill in the relevant art could not discern the boundaries of the claim based on the claim language, the specification, the prosecution history, and the knowledge in the relevant art.'" Volumetrics Med. Imaging, LLC v. Toshiba Am. Med. Sys., Inc., No. 1:05CV00955, 2011 WL 6934603 (M.D.N.C. Dec. 30, 2011) (citing Haemonetics Corp., 607 F.3d at 783). "Only claims 'not amenable to construction' or 'insolubly ambiguous'" should be held to be indefinite. Haemonetics Corp, 607 F.3d at 783.

## III. CONSTRUCTION OF THE DISPUTED CLAIMS

The '276 Patent is made up of twenty-one claims. Claims 1, 10, and 17 of the '276 Patent are independent claims, and the remaining claims are dependent.[2] The '575 Patent is made up of sixty-two claims. Claims 1, 10, 17, 30, 40, 47, 51, and 56 are independent claims, and the remaining claims are dependent. Because both the '276 Patent and the '575 Patent are made up of a large number of claims, each claim is not enumerated within this Opinion. Instead, the specific language of claims 1 and 8 of the '276 Patent and claims 1 and 8 of the '575 Patent are included below to provide context for the claim construction discussion to follow.[3]

Claims 1 and 8 of the '276 Patent read as follows (emphasis added to disputed terms):

**1.** A method of transmitting an electronic document, comprising:

*receiving an email message having a delivery address at an intermediate computer system;*

determining whether the email message has an attached document;

in the event the email message has the attached document:

*automatically creating a cleansed version* of the attached document at the *intermediate computer system* that received the email message by removing at

---

[2]"An independent claim is a claim that does not refer to any other claim of the patent. An independent claim must be read separately from the other claims to determine the scope of the claim. A dependent claim is a claim that refers to at least one other claim in the patent. A dependent claim incorporates all of the elements of the claim to which the dependent claim refers, as well as the elements recited in the dependent claim itself." Patent Jury Instruction Handbook § 2:7; see also Trinity Indus., Inc. v. Rd. Sys., Inc., 121 F. Supp. 2d 1028, 1049 n.2 (E.D. Tex. 2000) ("An independent claim stands on its own and does not refer to any other claim in the patent. It must therefore be read separately when determining its scope. A dependent claim, on the other hand, includes a reference to at least one other claim in the patent and must be interpreted to encompass each of its own elements as well as any additional elements recited in the referenced claim.").

[3]The language of these claims is provided in full because a majority of the disputed claim terms are included within these claims. However, the analysis of each disputed term will include reference to every claim, independent or dependent, in which the term is included.

least a portion of the metadata from the attached document;

replacing in the email message the attached document with the cleansed version of the attached document; and

sending the email message with the cleansed version of the attached document from the *intermediate computer system* to the *delivery address*.

**8.** The method of Claim 1, wherein *automatically creating a cleansed version* of the attached document further includes removing only *pre-specified* types of metadata *in accordance with a cleansing policy*.

Claims 1 and 8 of the '575 Patent read as follows (emphasis added to disputed terms):

**1.** A computer-based system for transmitting an electronic document, comprising:

an *intermediate computer* that is *remote* from an electronic device sending an email message, the *intermediate computer* including a memory storing instructions*; and*

*a processor configured to*:

execute the instructions to receive the email message from the electronic device, the email message having a *delivery address*,

execute the instructions to determine that the email message has an attached document including metadata,

execute the instructions to automatically create a cleansed verison of the attached document by removing at least a portion of the metadata from the attached document,

execute the instructions to replace in the email message the attached document with the cleansed version of the attached document, and

execute the instructions to send the email message with the cleansed version of the attached document from the *intermediate computer* to the *delivery address*.

**8.** The system of Claim 1, wherein the processor is further configured to, when *automatically creating a cleansed version* of the attached document, execute the instructions to remove only *pre-specified* types of metadata *in accordance with a cleansing policy*.

It is within this larger context of the claims themselves that the individual disputed claim terms will now be evaluated. The claim terms with proposed constructions from both parties will be construed first, followed by the claim terms Workshare contends cannot be construed due to indefiniteness.

8

A. Claim Terms with Opposing Constructions

   1.   **"receiving the email message having a delivery address at an intermediate computer system"**

The above referenced claim term is included within claims 1 and 10 of the '276 Patent. Defendant Litera Tech proposes that this claim term be construed as "receiving, at an intermediate computer system, an email message that has a delivery address of a recipient." In contrast, Plaintiff Workshare proposes that this claim term be construed as "receiving the email message, which contains a delivery address that identifies an intermediate computer system." Thus, the crux of the disagreement between Workshare and Litera Tech regarding this claim term centers on whether "delivery address" refers to the intended recipient of the email or to the intermediate computer system.

   To begin, the Court must consider the language of the claim term itself and the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Phillips, 415 F.3d at 1312-13. This person of ordinary skill "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent." Id. at 1313. Here, the disputed claim term is used at the beginning of claim 1 to illustrate the first step in the patented process of "receiving an email message having a delivery address at an intermediate computer system." ('276 Patent, col. 5, lines 56-57). At the end of claim 1, similar terms are used to detail the last step of the patented process, stating that after removing the relevant metadata from an attached document, the email message will then be sent "with the cleansed version of the attached document from the intermediate computer system to the delivery address." ('276 Patent, col. 6, lines 1-3). If

9

"delivery address" referred to the intermediate computer system and not the intended recipient of the email, the final step in claim 1 would not be necessary, as the email message would have already arrived at the intermediate computer system by that step in the process.

Further, the specification of the '276 Patent, which "contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it," indicates that "delivery address" should be interpreted as referring to the address of the intended recipient of the email and not the intermediate computer system. See Vitronics Corp., 90 F.3d at 1582. The section entitled "Summary" in the specification of the '276 Patent describes the following patented process:

> [a]n email sent from a mobile device is received by a gateway, email server, or other program . . .[i]n the event the email includes an attached document the attached document is analyzed to determine the nature of the metadata in the document. . . [t]he attached document is replaced with the cleansed version of the attached document, *and the email is sent according to the address (or addresses) included in the email* (or other delivery instructions specified in either the email or at the gateway, email server or other program).

('276 Patent, col. 2, lines 2-3, 9-10, 16-20) (emphasis added). This portion of the specification indicates that "delivery address" is not relevant to the email's initial receipt by a gateway, email server, or other program, but instead becomes relevant after the server has scanned and cleansed any attached documents. Following this step, the email is then sent "according to the address (or addresses) included in the email." ('276 Patent, col. 2, lines 16-18).

In opposing this construction, however, Workshare argues that Litera Tech's proposed construction seeks to rewrite claims 1 and 10 to match what is recited in claim 17 of the '276 Patent. Claim 17 of the '276 Patent reads "receiving at an intermediate computer system an

10

email having a delivery address and an attached electronic document sent from a mobile electronic device." ('276 Patent, col. 7, lines 6-8). Because the language of claim 17 contains a different phrasing than that in claims 1 and 10, Workshare argues that the claim terms must have different meanings. However, the language in claim 17, while drafted differently than the language in claims 1 and 10, does not support Workshare's proposed construction. Claim 17 describes a process where the email being received has an attached electronic document sent from a mobile electronic device. In contrast, claims 1 and 10 describe a process where an email message is received and a next step is taken to determine whether the email message has an attached document. Thus, the different phrasing within claims 1 and 10 and claim 17 does not indicate that "delivery address" in claims 1 and 10 refers to an intermediate computer system. Instead, the language of claims 1 and 10 themselves along with the '276 Patent's specification indicate that Litera Tech's proposed construction is the most appropriate. Accordingly, with regard to the disputed claim term "receiving the email message having a delivery address at an intermediate computer system", the Court adopts the following construction: "receiving, at an intermediate computer system, an email message that has a delivery address of a recipient."

### 2. "delivery address"

The above referenced claim term is included within claims 1, 10, and 17 of the '276 Patent and claims 1, 10, 27, 30, 40, 47, and 51 of the '575 Patent. Defendant Litera Tech proposes that this claim term be construed as "the plain meaning of the term, namely, an email address of a recipient to which the sender of an email directs the email to be delivered." In contrast, Plaintiff Workshare proposes that this claim term be construed as "a character or group

11

of characters that identifies a delivery destination."

Workshare's construction of "delivery address" is based upon a broad definition of the term's common meaning in network communications derived from the Institute of Electrical and Electronic Engineers Authoritative Dictionary. However, "[b]ecause words often have multiple dictionary definitions, some having no relation to the claimed invention, the intrinsic record must always be consulted." Texas Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1203 (Fed. Cir. 2002). Thus, "delivery address" must be viewed in the context of the claims within the '276 Patent and the '575 Patent in which it appears. Claim 1 of the '575 Patent uses the term in the following context:

> a processor configured to:
>> execute instructions to receive the email message from the electronic device, the email message having a *delivery address* . . .
>> execute the instruction to send the email message with the cleansed verison of the attached document from the intermediate computer to the *delivery address*.

('575 Patent, col. 5, lines 65-67, col. 6, lines 10-12).

The term "delivery address" is used in a similar context in the other claims in which it appears in the '575 Patent and the '276 Patent. This context indicates that "delivery address" is not referring to a broad group of characters identifying a destination, but instead is specifically referring to the email address to which the message is ultimately intended to be delivered. This construction is further supported by the use of the articles "a" and "the" within the relevant claims. While claim 1 of the '575 Patent first refers to "the email message having *a* delivery address," a subsequent step in the process includes sending the email message from the intermediate computer to "*the* delivery address." ('575 Patent, col. 5, line 67, col. 6, line 12)

(emphasis added). Thus, the term "delivery address" does not refer to a broad group of characters identifying a delivery destination as Workshare argues, but instead refers to the specific email address of the intended recipient.

Further, the sections entitled "Summary" in the specifications of the '276 Patent and the '575 Patent include language that "[t]he attached document is replaced with the cleansed version of the attached document, and the email is sent according to the address (or addresses) included in the email." ('276 Patent, col. 2, lines 16-19, '575 Patent, col. 2, lines 23-26). This reference to an address does not refer to "delivery address" in a broad sense, but instead refers to the specific address or addresses of the intended recipient included within the email. Thus, the relevant claims of the '276 Patent and the '575 Patent, along with the Patents' specifications, indicate that Litera Tech's proposed construction is most appropriate. Accordingly, with regard to the disputed claim term "delivery address", the Court adopts the following construction: "the plain meaning of the term, namely, an email address of a recipient to which the sender of an email directs the email to be delivered."

### 3. "delivery instructions"

The above referenced claim term is included within claim 28 of the '575 Patent. Defendant Litera Tech proposes that this claim term be construed as "information that determines the destination to which the message is to be delivered." In contrast, Plaintiff Workshare proposes that the claim be construed as "instructions specifying the delivery address." Claim 28 of the '575 Patent reads as follows (emphasis on disputed term):

"The system of Claim 17, wherein the processor is further configured to, when

13

transmitting the message, execute the instructions to transmit the message according to *delivery instructions*."

('575 Patent, col. 8, lines 6-9).

Because claim 28 is a dependent claim, it is also necessary to consider the text of claim 17, the independent claim upon which claim 28 is dependent. Claim 17 reads as follows:

> A computer-based system for transmitting an electronic document, comprising:
>
> > an computer that is remote from a device sending a message, the computer including a memory storing instructions; and
>
> a processor configured to:
>
> > execute the instructions to receive the message, the message including a document including metadata,
> >
> > execute the instructions to automatically create a cleansed verison of the document by removing at least a portion of the metadata from the document,
> >
> > execute the instructions to replace the document received with the message with the cleansed verison of the document, and
> >
> > execute the instructions to transmit the message with the cleansed version of the document.

('575 Patent, col. 7, lines 23-38).

Looking first to the language of claim 28 itself, the claim states that the processor is configured to "execute the instructions to transmit the message according to delivery instructions." ('575 Patent, col. 8, lines 7-9). In the context of claim 28, Workshare's proposed construction of "instructions specifying the delivery address" would be redundant, as a delivery address itself dictates where a message should be delivered. Further, claim 27 of the '575 Patent reads "[t]he system of claim 17, wherein the processor is further configured to, when transmitting the message, execute the instructions to transmit the message to a delivery address." ('575 Patent, col. 8, lines 3-5). If "delivery instructions" was construed to mean "instructions

14

specifying the delivery address" as proposed by Workshare, claims 27 and 28 would essentially be identical, as claim 27 addresses "instructions to transmit the message to a delivery address." Instead, based on the language of claim 28, Litera Tech's proposal that "delivery instructions" be interpreted as "information that determines the destination to which a message is to be delivered" is better supported by the language of the claims themselves.

Further, the specification also supports Litera Tech's proposed construction. The "Summary" section within the specification of the '575 Patent reads as follows:

> [i]n the event the email includes an attached document the attached document is analyzed to determine the nature of the metadata in the document. . . [t]he attached document is replaced with the cleansed version of the attached document, and the email is sent according to the address (or addresses) included in the email (*or other delivery instructions* specified in either the email or at the gateway, email server or other program).

( '575 Patent, col. 2, lines 15-17, 23-27) (emphasis added). The specification does not equate "address" and "delivery instructions" to have the same meaning. Instead, the specification draws a distinction between "address" and "delivery instructions," providing that the message will be sent according to the address or according to other delivery instructions. Thus, both the claim language and the specification support Litera Tech's proposed construction. Accordingly, with regard to the disputed claim term "delivery instructions", the Court adopts the following construction: "information that determines the destination to which a message is to be delivered."

B. Claim Terms Alleged by Workshare to be Indefinite

Workshare alleges that the remaining six terms to be construed by the Court are

15

indefinite and thus cannot be properly construed.  Before beginning an indefiniteness analysis, the Court notes the following language from the Federal Circuit in <u>Exxon Research Engineering Corp. v. United States</u>, 265 F.3d 1371, 1375 (Fed. Cir. 2001), addressing the proper inquiry in an indefiniteness analysis:

> Under a broad concept of indefiniteness, all but the clearest claim construction issues could be regarded as giving rise to invalidating indefiniteness in the claims at issue.  But we have not adopted that approach to the law of indefiniteness.  We have not insisted that claims be plain on their face in order to avoid condemnation for indefiniteness; rather, what we have asked is that the claims be amenable to construction, however difficult that task may be.  If a claim is insolubly ambiguous, and no narrowing construction can properly be adopted, we have held the claim indefinite.  If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds.

It is within this framework that the Court will address Workshare's arguments regarding indefiniteness as to each of the remaining six claim terms.

### 4-5. **"automatically creating a cleansed version"/"automatically remov[ing] the metadata" and "[according to a] cleansing policy"**

The Court will construe the above referenced claim term of "automatically creating a cleansed version" / "automatically remov[ing] the metadata" and "[according to] a cleansing policy" together, as Workshare's indefiniteness argument is based upon the inconsistency of the two terms when construed together.  The claim term "automatically creating a cleansed version" / "automatically remov[ing] the metadata" is included within claims 1, 8, 10, and 17 of the '276 Patent and claims 1, 8, 10 17, 25, 30, 40, 45, 47, 51, 56, and 61 of the '575 Patent.  Defendant Litera Tech proposes that this claim term be construed as "creating a cleansed version/remove[ing] the metadata upon or after receipt without the need for further action by

the sender." In contrast, Plaintiff Workshare proposes that this claim term is indefinite and cannot be construed. Alternatively, Plaintiff Workshare proposes the claim term be construed as "creating a cleansed version or removing metadata in all instances, without the ability of a user or administrator to choose otherwise."

The second above referenced claim term of "[according to a] cleansing policy" is included within claims 8, 10, and 12-16 of the '276 Patent and claims 8, 10, 12-16, 25, 30, 32-36, 45, 47, 49-54, and 61 of the '575 Patent. Defendant Litera Tech proposes that this claim term be construed as "a set of rules that determines what, if any, metadata is to be removed." In contrast, Plaintiff Workshare proposes that the claim term is indefinite and cannot be construed.

To support the assertion that the terms "automatically" and "according to a cleansing policy" are inconsistent when construed together, Workshare primarily relies on the prosecution history surrounding the '276 Patent. The prosecution history is relevant for the purposes of claim construction, as it is intrinsic evidence that "contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." Vitronics Corp., 90 F.3d at 1582.

The relevant prosecution history for the '276 Patent cited by both Litera Tech and Workshare is found in a letter from Litera Tech's prosecution counsel to the Patent Examiner. The letter reveals that the '276 Patent was originally rejected as being unpatentable in view of a previous U.S. Patent filed by inventor Lauren Antonoff ("the Antonoff Patent"). The prosecution history indicates that the word "automatically" was added to the claims of the '276 Patent in an effort to distinguish the '276 Patent from the Antonoff Patent. The relevant

17

portion of the prosecution history for the purposes of claim construction includes an effort by

Litera Tech's prosecution counsel to distinguish the '276 Patent from the Antonoff Patent and

reads as follows:

> *Antonoff* does not teach "automatically" creating a cleansed version "at the intermediate computer system that received the email message" and sending the email with the cleansed version "from the intermediate computer system to the delivery address" because *Antonoff* teaches an email-originating computer system that optionally scrubs an attached document "when the file is attached to an electronic email," (*Antonoff*, ¶ 0038; Fig. 2). *Antonoff's* system scrubs an email attachment before the email is originally sent depending on "whether or not the user wants to scrub the attached file" (*Antonoff*, ¶ 0048; Fig. 2). *Antonoff's* system is an originating system that generates the email and attachment in the first instance. *Antonoff's* originating system is not an intermediate computer system, as recited in claim 1, because it is not between the email-sending system and the final destination system for the email. Furthermore, *Antonoff's* originating system does not "automatically creating a cleansed version of the attached document," as recited in claim 1, because *Antonoff's* user may "choose[] not to scrub the attached file." *Id.*
>
> These are significant differences because *Antonoff's* originating system gives the user control over whether or not to apply the scrubbing process <u>before</u> sending an email. In *Antonoff's* system, the user can easily avoid the scrubbing process when sending an email with an attachment simply by choosing not to scrub the file. *Id.* The invention recited in claim 1, in contrast, prevents a user from circumventing the cleansing process because the user cannot control what happens after the email and its attachment leave the originating computer system and are received by an intermediate computer system. The invention recited in claim 1 automatically creates a cleansed version of the attached document at an intermediate computer system, such as an email server, that received the email message subsequent to email being sent from the originating computer system—thus, a user on the originating computer system cannot affect whether or not a cleansed version is created.

(Decl. in Support of Litera Tech [Doc. #41-10], at 12-14).

Based on this prosecution history, Workshare contends that the term "automatically"

must mean "creating a cleansed verison or removing metadata in all instances, without the ability

18

of a user or administrator to choose otherwise." Workshare contends that this interpretation is necessary because the prosecution history reveals an effort to distinguish the '276 Patent from the Antonoff Patent by showing that under the '276 Patent, "a user on the originating computer system cannot affect whether or not a cleansed version is created." (Decl. in Support of Workshare [Doc. 44-9], at 13-14). Workshare argues that Litera Tech can not now disclaim the meaning of "automatically" that it used to distinguish the '276 Patent from the prior art of the Antonoff Patent by seeking a construction that permits user choice.

Essentially, Workshare's argument regarding the term "automatically" is based upon the doctrine of prosecution disclaimer. Under the doctrine of prosecution disclaimer, a patentee is precluded from "recapturing through claim interpretation specific meanings disclaimed during prosecution." Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1323 (Fed. Cir. 2003). Indeed, "[w]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." Id. at 1324. However, in order for prosecution disclaimer to attach, "the alleged disavowing actions or statements made during prosecution [must] be both clear and unmistakable." Id. at 1326. Courts have "consistently rejected prosecution statements too vague or ambiguous to qualify as a disavowal of claim scope." Id. at 1325.

Based on the prosecution history before the Court, Workshare contends that the term "automatically" can only mean "creating a cleansed version or removing metadata in all instances, without the ability of a user or administrator to choose otherwise" because Litera

19

Tech clearly and unmistakably disclaimed any broader meaning. Based on this interpretation, Workshare further contends that "automatically" is internally inconsistent when construed with "[according to a] cleansing policy." The premise of Workshare's argument is that a "cleansing policy" that allows a user to determine what, if any, metadata is to be removed is "fundamentally and diametrically opposed" to the statement in the prosecution history that a "user on the originating computer system cannot affect whether or not a cleansed version is created." (Workshare Claim Const. Brief [Doc. #43], at 12). By setting the policy itself, Workshare contends that the user is directly affecting the metadata removal process. Thus, Workshare argues that "automatically" and "cleansing policy" are "insolubly inconsistent" and indefinite as a matter of law.

As noted above, in order for the doctrine of prosecution disclaimer to attach, "the alleged disavowing actions or statements made during prosecution [must] be both clear and unmistakable." Omega Eng'g, Inc., 334 F.3d at 1326. In response to Workshare's argument, Litera Tech contends that the prosecution history discussed above "merely distinguishes the operation of a desktop-based metadata-cleaning patent (Antonoff) from the server-based invention at issue here, and it points out the ways in which the server-based system gives organizations greater control over metadata and end users." (Litera Tech Claim Const. Brief [Doc. #42], at 14). Litera Tech argues that the prosecution history describes a process that is automatic "because it does not *require* additional user input at the time of sending, not because the user is necessarily *prohibited* from influencing what happens at the intermediate computer." (Litera Tech Claim Const. Brief [Doc. #42], at 12). Thus, Litera Tech argues that the doctrine

20

of prosecution disclaimer does not attach here because the alleged disavowing statements within the prosecution history are not clear and unmistakable.

Litera Tech further supports this contention by referencing another section within the same above-cited letter between Litera Tech's prosecution counsel and the Patent Examiner. Before reaching the "Response" section of the prosecution history where the Antonoff Patent is distinguished as discussed above, the letter first contains a section entitled "Amendments to the Claims." (Decl. in Support of Litera Tech [Doc. #41-10], at 4). This section contains the listing of additional claims to either supplement or replace the prior rejected verison of the '276 Patent. Within this section, explicitly denoted as a "new" claim, is the added claim reading "[t]he method of claim 7, wherein the cleansing policy allows users to choose not to cleanse pre-specified types of metadata." (Decl. in Support of Litera Tech [Doc. #41-10], at 9). Litera Tech argues that this recognition of user choice within the prosecution history indicates that user choice was not clearly disclaimed in the prosecution history.

The Court agrees that the prosecution history does not evidence a clear and unmistakable disclaimer of the ordinary meaning of the term "automatically" construed with the term "cleansing policy." Read in isolation, the statement within the prosecution history that "a user on the originating computer system cannot affect whether or not a cleansed version is created" could arguably be interpreted as a disclaimer of user choice. (Decl. in Support of Workshare [Doc. #44-9], at 13-14). However, when read in the context of the prosecution history as a whole, the statement cannot be viewed as a clear and unmistakable surrender of claim scope. Instead, a newly added claim within the prosecution history specifically references user choice,

stating that "the cleansing policy allows users to choose not to cleanse pre-specified types of metadata." (Decl. in Support of Litera Tech [Doc. #41-10], at 9). Further, the prosecution history contains a statement highlighting one distinction between the Antonoff Patent and the '276 Patent that arises "because *Antonoff's* original system gives the user control over whether or not to apply the scrubbing process <u>before</u> sending an email." (Decl. in Support of Litera Tech [Doc. #41-10], at 13). If the prosecution history intended to clearly and unmistakably disclaim user choice in its entirety, highlighting a distinction between the timing of a user's ability to control the scrubbing process would be futile, as the user would never have the ability to affect the scrubbing process.

Accordingly, the doctrine of prosecution disclaimer does not properly attach here because "the alleged disavowing actions or statements made during prosecution" are not "clear and unmistakable." <u>Omega Eng'g, Inc.</u>, 334 F.3d at 1326. Further, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." <u>Phillips</u>, 415 F.3d at 1317. Because the doctrine of prosecution disclaimer cannot attach with regard to the terms "automatically" and "cleansing policy," other intrinsic evidence, including the language of the claims themselves and the Patents' specifications, must be considered in order to determine whether the two disputed terms are indefinite or can be construed as consistent with one another.

Beginning with the language of the claims themselves, independent and dependent claims within both the '276 Patent and the '575 Patent contain the term "automatically." For example,

claim 8 of the '276 Patent, a dependent claim, reads as follows: "the method of Claim 1, wherein automatically creating a cleansed version of the attached document further includes removing only pre-specified types of metadata in accordance with a cleansing policy." ('276 Patent, col. 6, lines 20-23). Claim 8 of the '575 Patent, a dependent claim, reads similarly, stating: "[t]he system of claim 1, wherein the processor is further configured to, when automatically creating a cleansed verison of the attached document, execute the instructions to remove only pre-specified types of metadata in accordance with a cleansing policy." ('575 Patent, col. 6, lines 33-37). The language of these claims reveals that "automatically" may be limited by pre-specified instructions regarding what types of metadata should be scrubbed.

This limitation is also seen in claim 10 of the '276 Patent, an independent claim, which reads in relevant part as follows:

> determining, at the intermediate computer system, whether the attached document is to be cleansed of metadata according to a cleansing policy;
> in the event the attached document is to be cleansed:
>> automatically removing metadata from the attached document . . .

('276 Patent, col. 6, lines 36-41). Further, claim 25 of the '575 Patent, a dependent claim, reads: "[t]he system of claim 17, wherein the processor is further configured to, when automatically creating a cleansed version of the document, execute the instructions to remove only pre-specified types of metadata in accordance with a cleansing policy." ('575 Patent, col. 7, lines 61-65). Thus, the claim language of both Patents suggests that the term "automatically" can be limited by a pre-specified cleansing policy.

This suggestion is further supported by a consideration of the claim language surrounding

23

"[according to a] cleansing policy." Claim 16 of the '575 Patent states "[t]he system of Claim 10, wherein the cleansing policy allows a user to choose not to cleanse pre-specified types of metadata." ('575 Patent, col. 7, lines 19-20). Claim 16 of the '276 Patent, a dependent claim, is almost identical, stating: "[t]he method of claim 10, wherein the cleansing policy allows users to choose not to cleanse pre-specified types of metadata.'" ('276 Patent, col. 7, lines 1-3). Claims 16 of the '575 and '276 Patents are dependent on claims 10 of each respective Patent. Thus, they must be interpreted to encompass the elements recited in claim 10, including the terms "automatically" and "according to a cleansing policy." See Trinity Indus. Inc., 121 F. Supp. 2d 1049.

Based on the relevant claim language, the Patents indicate that an electronic document can be "automatically" scrubbed for metadata, but this scrubbing may be subject to a pre-specified cleansing policy dictating what types of metadata should be scrubbed from email attachments. A user may need to take no further step than simply pressing "send," and the electronic document will then be "automatically" scrubbed according to a pre-specified cleansing policy that allows users to choose what types of metadata is to be scrubbed at the intermediate computer system.

In addition to the prosecution history and the language of the claims themselves, this interpretation is further supported by the specifications of both Patents. With regard to the "cleansing policy," both Patents' specifications state that "[i]f at Step 304 the attached electronic document contains metadata that the user or administrator has selected as 'to be removed' (Metadata properties can be pre configured to remove some or all metadata), then at step 305

24

the metadata is removed from the attached electronic document." ('276 Patent, col. 3, lines 39-44; '575 Patent, col. 3, lines 48-52). Thus, the Patents themselves, in both the language of the claims and the specifications, describe a scrubbing process that can occur automatically, but is subject to a pre-specified cleansing policy set by an administrator or user. This cleansing policy specifies what, if any, metadata should be scrubbed, and the scrubbing is then performed automatically at the intermediate server without any further steps necessary by a user or administrator.

Overall, Litera Tech's proposed construction, unlike Workshare's alleged disclaimer, is more fully supported by the intrinsic record as a whole, including the language of the claims themselves, the specifications, and the prosecution history. "For a prosecution statement to prevail over the plain language of the claim, the statement must be clear and unmistakable." Elbex Video, Ltd. v. Sensormatic Elecs. Corp., 508 F.3d 1366, 1373 (Fed. Cir. 2007). Here, the statement by Litera Tech in the prosecution history that a "user on the originating computer system cannot affect whether or not a cleansed version is created" does not clearly and unmistakably disclaim user choice. (Workshare Claim Const. Brief [Doc. #43], at 12). Further, Workshare has not shown by clear and convincing evidence that the terms "automatically" and "cleansing policy" are "insolubly inconsistent." Instead, the Federal Circuit has directed that "[i]f the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." Exxon Research Eng'g Corp., 265 F.3d 1371 at 1381-82. Because Litera Tech has proposed constructions for "automatically"

and "cleansing policy" that are consistent with one another and discernable from the claim language, specifications, and prosecution history, the claims should not be construed as indefinite. Accordingly, with regard to the disputed claim term "automatically remov[ing] the metadata"/ "automatically remov[ing] the metadata", the Court adopts the following construction: "creating a cleansed version/remove[ing] the metadata upon or after receipt without the need for further action by the sender." Further, with regard to the disputed claim term "[according to a] cleansing policy", the Court adopts the following construction: "a set of rules that determines what, if any, metadata is to be removed."

### 6. "pre-specified"

The above referenced claim term is included within claims 8, 15, and 16 of the '276 Patent and claims 8, 15, 16, 25, 34, 35, 36, 38, 39, 45, 49, 50, 53, 54, 55, and 61 of the '575 Patent. Defendant Litera Tech proposes that this claim term be construed as the "plain meaning of the term, namely, specified before the process of sending an email is initiated." In contrast, Plaintiff Workshare proposes that this claim term is indefinite and cannot be construed.

In support of its indefiniteness contention, Plaintiff Workshare argues that "pre-specified" is indefinite based on the above discussed arguments regarding "automatically" and "cleansing policy." Generally, because "pre-specified" would require a user to choose a cleansing policy, Workshare argues it is inconsistent with the term "automatically." However, because the Court has construed the terms "automatically" and "cleansing policy" as being consistent with one another and not indefinite, Workshare's argument regarding the term "pre-specified" necessarily fails as well. Litera Tech's proposed construction is the most appropriate,

as it is supported by intrinsic evidence and is consistent with the Court's constructions of "automatically creating a cleansed version"/"automatically remov[ing] the metadata" and "[according to a] cleansing policy." Accordingly, with regard to the disputed claim term "pre-specified", the Court adopts the following construction: "plain meaning of the term, namely, specified before the process of sending an email is initiated."

### 7. "intermediate computer system"/"intermediate computer"

The above referenced claim term is included within claims 1, 4, 5, 10, 17, and 21 of the '276 Patent and claims 1, 10, 30, 47, 51, and 56 of the '575 Patent. Defendant Litera Tech proposes that this claim term be construed as an "email server, program in communication with an email server, or any other computer or program that is located between a sender's originating system and an ultimate recipient's system." In contrast, Plaintiff Workshare proposes that the claim term is indefinite and cannot be construed.

In support of its assertion of indefiniteness, Workshare contends that Litera Tech's proposed construction renders the claim indefinite if in each instance that the term "intermediate computer" appears in a claim, the term could be interpreted to mean "any one of the instrumentalities that Litera lists." (Workshare Claim Const. Brief [Doc. #43], at 18). Because Litera Tech proposes that an "intermediate computer system" could be an "email server, program in communication with any email server, or any other computer program that is located between a sender's originating system and an ultimate recipient's system," Workshare argues the term is "insolubly ambiguous" because it is "entirely unclear what type of system would be infringing." (Workshare Claim Const. Brief [Doc. #43], at 19). In support of this

27

contention, Workshare cites to the principle that "the purpose of the definiteness requirement is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude." Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347 (Fed. Cir. 2005).

However, "the definiteness of claim terms depends on whether those terms can be given any reasonable meaning." Id. Litera Tech argues that "intermediate computer system" plainly refers to a "gateway, email server, or other program" where the scrubbing function is performed. (Litera Tech Claim Const. Brief [Doc. #42], at 11). In support of this contention, Litera Tech references the "Summary" within both Patents' specifications, which states that "an email sent from a mobile device is received by a gateway, email server or other program." ('276 Patent, col. 2, lines 5-6; '575 Patent, col. 2, lines 12-13). Additionally, both Patents' specifications indicate that "[t]he email may be sent to a gateway which implements the metadata removal process described below, or the email may be sent to an email server, or to another program in communication with the email server." ('276 Patent, col. 2, lines 61-65; '575 Patent, col. 3, lines 1-5). Thus, the Patents' specifications indicate that the scope of the Patents includes an "intermediate computer system" that can be a "gateway, email server, or other program."

The prosecution history of the '276 Patent further supports this proposed construction. The prosecution history highlights the intermediate nature of the computer system, revealing an effort to distinguish the Antonoff Patent by noting that "*Antonoff's* originating system is not an intermediate computer system, as recited in claim 1, because it is not between the email-sending system and the final destination system for the email." (Decl. in Support of Litera Tech [Doc.

#41-10], at 13). This prosecution history does not seek to distinguish the type of intermediate computer system, but instead seeks to emphasize the location of the intermediate computer between the email's originating system and the final destination for delivery of the email as being the distinguishing factor.

Thus, the claim language, specifications, and prosecution history indicate that the distinctive nature of the "intermediate computer system" claimed in the '276 and '575 Patents lies not in the type of intermediate system, that is, an email server, gateway, or any other program, but instead lies in the system's location between the origin of the original email and the final destination of the email. While Workshare argues that Litera Tech's proposed construction would make it entirely unclear what type of system would be infringing, the claims delineate the scope of the Patents to include the location of the system between the originating device and the ultimate destination, not the specific type of system.

At the hearing, Workshare's counsel expressed concern that if the Court adopted Litera Tech's proposed construction, the term "intermediate computer system" could have multiple meanings within the same claim, as the term appears multiple times within single claims. For example, while claim 1 of the '276 Patent begins with the step of "receiving an email message having a delivery address at an intermediate computer system," it ends with the step of "sending the email message with the cleansed version of the attached document from the intermediate computer system to the delivery address." ('276 Patent, col. 5, lines 55-56, col. 6, lines 1-3). Workshare contends that "intermediate computer system" in the first instance could mean "email server," while the next use of "intermediate computer system" within the same claim

could mean "gateway," thus making the claims indefinite. However, the Court notes that Litera Tech's proposed construction would not enable "intermediate computer system" to have multiple meanings within the same claim. For example, the previously construed term "delivery address" is first addressed in the relevant claims as "*a* delivery address" and later referred to in the claims as "*the* delivery address." ('276 Patent, col. 5, line 56, col. 6, line 3). The Court earlier construed "delivery address" to mean "the plain meaning of the term, namely, an email address of a recipient to which the sender of an email directs the email to be delivered." It follows that when "delivery address" is first referenced in a claim, any subsequent use of the term would then be in reference to the specific delivery address or addresses to which the email message is being sent. Similarly, once the specific type of "intermediate computer system" is identified, albeit an email server, program in communication with an email server, or any other computer program, that specific type of intermediate computer system would then be the same type of system throughout the rest of the claim.

Thus, Workshare has not shown by clear and convincing evidence that Litera Tech's proposed construction renders the claim "insolubly ambiguous." Instead, based on the intrinsic evidence, the distinctive nature of the intermediate computer system being claimed within the Patents extends to the location of the system between the originating device and the ultimate destination, not in the specific type of system. Accordingly, with regard to the disputed claim term "intermediate computer system", the Court adopts the following construction: "email server, program in communication with an email server, or any other computer or program that is located between a sender's originating system and an ultimate recipient's system."

30

8.    "remote"

The above referenced claim term is included within claims 1, 10, 17, 30, 40, 47, 51, and 56 of the '575 Patent. Defendant Litera Tech proposes that this claim term "carries its plain and ordinary meaning, namely, an intermediate computer that is distinct from the originating device." In contrast, Plaintiff Workshare proposes that this claim term is indefinite and cannot be construed.

The term "remote" only appears in the '575 Patent, and it is only used to modify "intermediate computer system." For example, claim 1 reads "an intermediate computer system that is remote from an electronic device sending an email message." ('575 Patent, col. 5, lines 61-62). Claim 10 reads "an intermediate computer that is remote from a mobile electronic device sending an email message." ('575 Patent, col. 6, lines 45-46). The term "remote" must be considered in the context of the above construction of "intermediate computer system" because Workshare contends that "remote" is indefinite based on its contention that "intermediate computer system" is indefinite.

Because the Court has construed "intermediate computer system" to mean "email server, program in communication with an email server, or any other computer or program that is located between a sender's originating system and an ultimate recipient's system," the term "remote" cannot now be found to be indefinite, as it simply modifies "intermediate computer system" and supports the previous distinction of a system sitting intermediately, between the originating device and the ultimate destination. Accordingly, with regard to the disputed claim term "remote", the Court adopts the following construction: "its plain and ordinary meaning,

31

namely, an intermediate computer that is distinct from the originating device."

### 9. ". . .; and a processor configured to:"

The above referenced claim term is included within claims 1, 10, 17, and 30 of the '575 Patent. Defendant Litera Tech proposes that this claim term be construed as the "plain meaning of the term, namely, a processing unit that hosts certain computing capabilities, *i.e.* a processor that is capable of executing instructions." In contrast, Plaintiff Workshare proposes that this claim term is indefinite and cannot be construed.

In order to understand Workshare's indefiniteness contentions, it is necessary to provide the broader context for the phrase at issue. The relevant portion of claim 1 of the '575 Patent reads as follows:

> 1. A computer-based system for transmitting an electronic document, comprising:
>> an intermediate computer that is remote from an electronic device sending an email message, the intermediate computer including a memory storing instructions*; and*
>
> *a processor configured to*:
>> execute the instructions to receive the email message from the electronic device, the email message having a delivery address . . .

'575 Patent, col. 5, lines 59-67) (emphasis added).

Workshare's invalidity contention hinges on the '575 Patent's use of a semicolon before the phrase "and a processor configured to." Workshare contends that because of this semicolon, the claims must be read as having "'an intermediate computer' and a disembodied 'processor' for executing instructions." (Workshare Claim Const. Brief [Doc. #43], at 19).

32

Further, Workshare argues that because "Litera contends that the 'intermediate computer' *is* the computer or program that processes email attachments, it is unclear where the claimed 'processor' is housed and how *it* can be the instrumentality for executing scrubbing instructions." (Workshare Claim Const. Brief [Doc. #43], at 19-20). Based on these arguments, Workshare contends the claim term is indefinite.

However, Litera Tech argues that the use of a semicolon does not imply that the intermediate computer and the processor must be separate. Instead, Litera Tech argues that in the context of the '575 Patent's specification and prosecution history, a conclusion that an intermediate computer and a separate "disembodied" processor perform the cleansing function is not plausible. (Litera Tech Reply Brief [Doc. #48], at 10). While Workshare is correct that the term "processor" is not referenced anywhere in the specification, this does not mean that the specification cannot be useful in determining the intended meaning of the term. The specification of the '575 Patent states that "the email may be sent to a gateway which implements the metadata removal process . . . or the email may be sent to an email server, or to another program in communication with the email server . . . the email server may send the attached document to the gateway, or the email server may perform the metadata removal process." ('575 Patent, col. 3, lines 1-9). This specification language describes a process in which the intermediate system, whether a gateway, email server, or other program, performs the metadata removal process on its own. Further, a dependent claim referring to the processor reads: "[t]he system of Claim 1, wherein the processor is further configured to, when removing the [sic] at least a portion of the metadata, execute the instructions to invoke a metadata removal

33

application." ('575 Patent, col. 6, lines 13-16).

Thus, the intrinsic evidence provides no indication of a separate, disembodied processor that actually executes the instructions to invoke the pre-specified cleansing policy. While Workshare argues that this renders the term indefinite, this argument does not show, by clear and convincing evidence, that the claim cannot be interpreted. Instead, "[i]f the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree," the claim is "sufficiently clear to avoid invalidity on indefiniteness grounds." Exxon Research Eng'g Corp., 265 F.3d at 1376.

Here, the semicolon preceding "and a processor configured to" could be interpreted to separate the two characteristics of the intermediate computer system. Within claim 1, the '575 Patent makes reference to an intermediate computer system "including a memory storing instructions" and "a processor configured to" perform certain functions. ('575 Patent, col. 5, lines 62-64). The use of a colon following the "processor configured to:" seems to delineate the specific configurations of the processor listed after the colon. However, this does not mean that the processor must be independent of the intermediate computer. Instead, the semicolon can be interpreted to separate the "memory storing instructions" from the "processor" configurations, as the delineated configurations would apply only to the processor and not the memory storing instructions.

Because the claim language and specification indicate that Litera Tech's proposed construction is supported by intrinsic evidence, Workshare has not shown by clear and convincing evidence that the term is indefinite. Accordingly, with regard to the disputed claim

term ". . .; and a processor configured to:", the Court adopts the following construction: "a processing unit that hosts certain computing capabilities, *i.e.* a processor that is capable of executing instructions."

III.   CONCLUSION

IT IS ORDERED that after considering the competing claim construction briefs filed by the parties and hearing oral argument at the Claim Construction hearing on February 14, 2013, the claim terms presented by the parties for construction are construed as follows:

(1) The term "receiving the email message having a delivery address at an intermediate computer system" is construed to mean "receiving, at an intermediate computer system, an email message that has a delivery address of a recipient."

(2) The term "delivery address" is construed to mean "the plain meaning of the term, namely, an email address of a recipient to which the sender of an email directs the email to be delivered."

(3) The term "delivery instructions" is construed to mean "information that determines the destination to which a message is to be delivered."

(4) The term "automatically creating a cleansed version" / "automatically remov[ing] the metadata" is construed to mean "creating a cleansed version/remove[ing] the metadata upon or after receipt without the need for further action by the sender."

(5) The term "[according to a] cleansing policy" is construed to mean "a set of rules that determines what, if any, metadata is to be removed."

35

(6) The term "pre-specified" is construed to mean the "plain meaning of the term, namely, specified before the process of sending an email is initiated."

(7) The term "intermediate computer system" / "intermediate computer" is construed to mean an "email server, program in communication with an email server, or any other computer or program that is located between a sender's originating system and an ultimate recipient's system."

(8) The term "remote" is construed to mean "its plain and ordinary meaning, namely, an intermediate computer that is distinct from the originating device."

(9) The term ". . . ; and a processor configured to:" is construed to mean "a processing unit that hosts certain computing capabilities, *i.e.* a processor that is capable of executing instructions."

This, the 28th day of March, 2013.


United States District Judge